UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:13-CV-00081-TBR


BRIAN KEITH MOORE                                                                    Plaintiff,

v.

PHILIP PARKER, WARDEN, *et al.*                                                      Defendants.


**MEMORANDUM OPINION AND ORDER**

Plaintiff Brian Keith Moore, a state inmate incarcerated at the Kentucky State Penitentiary (KSP),

filed this *pro se* action against various KSP officers and employees.   On initial review of the complaint

pursuant to 28 U.S.C. § 1915A and *McGore v. Wrigglesworth*, 114 F.3d 601 (6th Cir. 1997), the Court

allowed certain of Moore's claims for violation of the Eighth Amendment, the Americans with

Disabilities Act, and the Rehabilitation Act to proceed for further development.   (Docket No. 6.)

Defendants Jay Jones, Anthony Hale, Richard Moore, Douglas Mumma, and C. West have now moved

for summary judgment.  (Docket No. 26.)  Moore has filed a response.  (Docket No. 31.)  As such, the

matter stands ripe for decision.  For the reasons that follow, the Court will GRANT IN PART and DENY

IN PART Defendants' motion.


**Factual Background**

**I.      Moore's medical history**

Because the instant lawsuit concerns in part Moore's knee injury, weight, and the effect of each

upon his mobility, the Court will summarize the information that the parties have provided concerning

Moore's medical history.   There is no dispute that Moore suffers from "grossly morbid obesity and

inability to negotiate normal movements." (Docket No. 26-22.)  However, the parties seem to disagree as

to the relationship between Moore's weight and his difficulty walking.  Defendants say that the two

conditions are linked.  As far back as 2008, Dr. Steve Hiland of KSP described Moore's abdomen as

abnormally "large and pendulous secondary to [a] large amount of visceral fat"; Dr. Hiland advised Moore to "lose weight and get some exercise." (Docket No. 26-1.)

On October 13, 2011, Moore participated in a fight with another inmate. He reported that the resultant injuries left him unable to bear weight on his right knee. (Docket No. 26-6.) After using a walker for several months, in February 2012, Moore complained that his right knee continued to "go out on him," nearly causing him to fall. (Docket No. 26-13.) KSP physicians advised that he suffered from arthritis that could improve with weight loss, but that treatment options were limited due to Moore's weight, diabetes, and history of venous stasis with ulcers. (Docket Nos. 26-13, 26-14.)

Moore's condition apparently failed to improve. On April 4, 2012, medical staff advised Moore that he "ha[d] to make an effort" to walk with a walker to the gate where medical staff dispensed medication, including the insulin used to treat his diabetes. If he failed to do so, they warned, he would be housed in the infirmary. A report supplied by Defendants indicates that Moore replied that he did not have to take his insulin. (Docket No. 26-15.) Three days later, on April 7, 2012, Moore walked to the front of his housing unit for glucose testing; according to medical records, Moore moved with a "very slow[,] steady [gait]" and expressed his displeasure that nursing staff refused to hand-deliver his medication.[1]

---

[1] Nursing staff noted:

> [D]uring noon pill pass inmate with aid of walker self-ambulated to SSU gate to perform own [Accu-Check]. [T]his used to be "normal" activity for this inmate and others to arrive at gate for noon pill call. [T]his inmate had very slow steady gate [sic], but was able to walk the length of exercise area for SSU without hesitation. Inmate is upset for having to walk to the gate again. [S]ays will talk with Dr. Hiland and have nursing staff   continue to hand-deliver medication or this inmate is going to sign a refusal for all [Accu-Checks] and medication. [A]dvised inmate that putting ones self [sic] health at risk is not the answer.

(Docket No. 26-16.)

A similar scenario occurred the following day:

On April 23, 2012, one week before the incident that motivated this lawsuit, Moore again complained that he was required to walk to the gate to receive medication despite his ongoing knee pain. Per an order from Dr. Hiland, medical staff informed Moore that if he was unable to walk to the gate to undergo glucose testing, he would be admitted to the infirmary. (Docket No. 26-18.) Nursing staff observed, "[I]nmate is very obese and does not have an exercise [regimen] to follow to promote good health." (Docket No. 26-18.)

On April 29, 2012, the day before the incident at issue, Moore refused to leave his cell for glucose testing. Moore was again advised that he needed a dietary and exercise plan, as he had become "idle and severe[ly] obese." (Docket No. 26-19.) The same day, KSP nursing staff entered the following in Moore's medical chart:

> Inmate does not utilize walker for ambulating short distances in cell. [I]nmate does not exercise to promote [strengthening] of muscles to lower extremities. Inmate now has begun to utilize a mop bucket to self-propel . . . to have [Accu-Check] performed. [A]dvised to inmate not a safe mode of transportation. The mop bucket is not designed to carry people as a wheelchair. This inmate is severely overweight and diabetic and using poor eating habits[;] no exercise [regimen] to promote good health. Shift Captain has been informed of mop bucket and its use to this inmate and has been denied to use the mop bucket to transport self to gate. Inmate has been ambulating with walker, but quit and has been

> [I]nmate upset due to having to walk to gate for [Accu-Check]. [T]his was the normal routine for 6CH [Moore's housing unit], but when inmate hurt knee and was given walker many months ago inmate has not been ambulating as should be for knee to recover[.] Since his injury nursing staff enters walk and delivers to each inmate noon medication. If any inmates are out they would have to be secured before entering SSU. Inmate was upset about walking to gate and said [T]uesday he is talking to Doc and getting it fixed so he doesn't have to walk or he is going to sign a refusal for [Accu-Checks]. [A]dvised inmate not to deny self treatment for diabetes. [I]nmate finished own [Accu-Check] and with aid of walker went back to cell. Inmate was able to stand and perform own [Accu-Check].

(Docket No. 26-17.)

refusing to leave cell and wants medical to come to cell and perform
[Accu-Check].

(Docket No. 26-20.)

## II.    The incident of April 30, 2012

Defendants contend that on April 30, 2012, KSP medical staff attempted to provide Moore with pain management medication but needed to ascertain his weight to determine whether more aggressive options were appropriate.   Because Moore's weight exceeded the limits of the medical scale, KSP officials planned to weigh him on the facility's industrial scale.   (*See* Docket No. 27, Affidavit of Anthony Hale.)  Moore estimates that he weighed approximately 400 pounds at this time.  (Docket No. 1 at 11.)

At approximately 8:30 a.m., Defendant Corrections Officer Mumma ordered Moore to exit his cell to be escorted to the infirmary.  Moore refused, telling Mumma, "I'm not walking out of here, you can get a wheelchair or guards to carry me out.  But I'm not walking."  (Docket No. 26-6, Disciplinary Report Form.)  When Mumma ordered Moore to stand up and exit his cell, Moore again refused.

Defendant Captain Jones then ordered Defendant Sergeant Anthony Hale to escort Moore to the infirmary.  According to Hale, Moore walked to the front of his cell unassisted by his walker and sat on the toilet.  Defendants allege that when Moore expressed that he could not walk to the infirmary, Hale advised him that officers would drive him to the infirmary in a utility vehicle.  Hale stated that because he did not see a walker in Moore's cell at this time, he suggested that they use a chair as a makeshift walker. Moore refused, stating, "Hale, I told you that I'm not walking anywhere."  (Docket No. 27.)

Captain Jones and other officers arrived to facilitate the transport, but Moore continued to refuse to exit his cell.  (Docket Nos. 26-27, 26-28.)  The parties dispute Moore's physical condition:  although Moore says that his injured knee left him unable to move, Defendants insist that Moore was capable of walking but simply refused to do so.  Whatever the reason for Moore's noncompliance, Defendants performed a cell extraction to remove him from the cell.  Defendants contend that after they shackled

4

Moore's extremities, he "stepped into the doorway of the cell, then just laid down on the walk" and refused to move.   (Docket No. 26-27, Affidavit of Anthony Hale.)  Moore disputes this characterization, arguing instead that he "was only able to take two or three steps" before his "knee gave out," causing him to fall the floor.  (Docket No. 1 at 10.)

After Moore's collapse, Captain Jones instructed the officers, "Get him to the front of the unit the best way you can."  (Docket No. 26-27, Affidavit of Anthony Hale.)  Defendants state that the officers surrounded Moore, secured his extremities, and "gradually pull[ed] him a short distance at a time, being careful not to drag him by the restraints on his arms and ankles."  (Docket No. 26-27.)  However, Moore asserts that Defendants dragged him between 100 and 120 feet by his arms and the handcuffs that shackled them before placing him in a wheelchair.[2]   He contends that this event caused pain in his shoulders and constituted excessive force in violation of the Eighth Amendment.

Moore further alleges that during his transport to the infirmary and throughout his time there, Defendants denied him a walker or other mobility aid, leaving him unable to access the toilet, his meal trays, or his medication.  As a result, he says, he missed three meals, four dosages of medicine, and was forced to urinate on the floor.  (Docket No. 1 at 13.) He sues Defendants in their official capacities, alleging that this deprivation violated both the Americans with Disabilities Act (ADA) and the Rehabilitation Act.

### Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[2]  Defendants say that officers delivered a heavy-duty wheelchair to the area just outside the walk gate, approximately 100 feet from Moore's cell.  Because it was designed to accommodate plus-sized individuals, the wheelchair was not collapsible and would not pass through the gate.  (Docket No. 26-27.)

The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support an essential element of the nonmoving party's case for which he or she has the burden of proof.  *Id.*   Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof.  *Id.* If the record taken as a whole could not lead the trier of fact to find for the nonmoving party, the motion for summary judgment should be granted.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Where the nonmoving party bears the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  The nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury.  *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F. SUpp. 214, 217 (E.D. Mich. 1990).  The moving party, therefore, is "entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof."  *Id.* (internal quotation marks omitted).

## Analysis

### I.        Eighth Amendment claim

Moore alleges that Defendants used unjustified force to drag him across the floor in order to take him to the infirmary, inflicting unnecessary and excessive pain in violation of the Eighth Amendment. Defendants categorically deny having used excessive force, arguing instead that they "slowly and carefully" carried Moore to the infirmary.

To prevail on his excessive force claim under the Eighth Amendment, Moore must show that force was not "applied in a good-faith effort to maintain or restore discipline," but "maliciously and

sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1 (1992); *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986).  The test for whether force is excessive in violation of the Eighth Amendment has both an objective and a subjective component:  the harm must be objectively serious and subjectively wanton. *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993) (citing *Wilson v. Seiter*, 501 U.S. 294, 298) (1991)).  The objective component of the inquiry is subject to "contemporary standards of decency." *Hudson*, 503 U.S. at 8 (citations omitted).

Accordingly, Defendants' emphasis upon the fact that Moore has not demonstrated a causal connection between his lingering shoulder pain and the April 30, 2012, incident is misplaced.  Moore's medical chart notes that on March 9, 2013, Moore complained of continued pain in his right arm and shoulder that had persisted since the incident.  Dr. Hiland concluded that the incident did not cause Moore's shoulder pain, finding no relationship between Moore's allegations and his continued discomfort.  (Docket No. 26-24.)  Defendants argue that Moore's doubts of Dr. Hiland's conclusion does not constitute a basis to advance his claims.  However, Moore need not prove an ongoing injury.  Instead, as the Supreme Court has explained, "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated"—even if no significant injury results. *Hudson*, 503 U.S. at 9 (citations omitted).

Of course, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Id.* (quoting *Johnson v. Glick*, 481 F.2d at 1028, 1033 (2d Cir. 1973)).  The Court must weigh "whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).   To survive Defendants' motion, then, Moore must proffer evidence that Defendants maliciously and sadistically used force to cause harm.

7

Moore has presented sufficient evidence from which a reasonable jury could find that Defendants engaged in excessive force with indifference to the pain they inflicted. Moore has filed twelve affidavits by inmates who claim to have witnessed the incident. (*See* Docket No. 31-1.) Several of these statements describe a rougher scene than Defendants suggest; for example, one states that guards dragged Moore "by his handcuffed hands," "pulling [him] by the chain which links the two cuffs together." (Docket No. 31-1 at 1, Affidavit of Leif C. Halvorsen.) Other statements also indicate that Defendants dragged Moore by the handcuffs. (*See* Docket No. 31-1, Statement of Victor Taylor ("I saw the officers drag Brian off the unit by the handcuffs."; Affidavit of Roger Epperson ("They used the handcuffs to drag him."); Affidavit of William Eugene Thompson ("I saw some guards drag Brian Moore by the handcuffs . . . ."); Affidavit of Ronnie Bowling ("[T]hey drug Brian by the handcuffs on the floor."; Affidavit of David E. Matthews ("I notice[d] on 4-30-12 that 3 or 4 guards were dragging [Brian] Moore down G-walk by handcuffs and they also had him in leg irons."). Should a jury accept this evidence, it could reasonably conclude that dragging an inmate approximately 100 feet by handcuffs is an unreasonable means by which to transport him. Although Defendants categorically deny having used excessive force or having improper motivations, such matters are more appropriately addressed by a jury.

Finally, Defendants argue that qualified immunity insulates them from liability. The doctrine of qualified immunity protects public officials performing discretionary functions from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A tripartite test governs whether qualified immunity applies. First, the Court must determine whether a constitutional violation occurred; second, it must determine whether the right that was violated was clearly established and would be known by a reasonable person; and finally, it considers whether the plaintiff has alleged sufficient facts, supported by sufficient evidence, to indicate that the official's actions were objectively unreasonable in light of the established rights. *Williams v. Mehra*, 186 F.3d 685, 681 (citing *Dickerson v.*

*McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996)).  The Supreme Court affirmed this analysis in *Saucier v. Katz*, 533 U.S. 194 (2001).

Moore's factual allegations describe a deprivation of his Eighth Amendment rights.  The Supreme Court has clearly established the right to be free from force applied maliciously and sadistically and intended to cause harm.  *Hudson v. McMillian*, 503 U.S. 1 (1992).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 194.  Moore's allegations, if proven, would demonstrate objectively unreasonable behavior on the part of Defendants.  Accordingly, qualified immunity does not apply.

## II.     Americans with Disabilities Act and Rehabilitation Act Claims

Moore further alleges that Defendants violated Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 1201-12213.  He alleges that Defendants caused him to sustain physical injuries during his transportation to the infirmary and his detention once there.  This claim appears to arise from his alleged denial of a walker or other mobility aide during this period.  Moore relies upon the same facts to assert a claim under the Rehabilitation Act, which contains language similar to that of the ADA.[3]  *See*  29 U.S.C. § 794.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, program, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  To prove a violation of Title II, Moore must show that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, and (3) that such exclusion, denial of benefits, or discrimination was because of a

---

[3] To establish a violation of the Rehabilitation Act, Moore must show that he was a "handicapped person;" was "otherwise qualified" to participate in the program; was denied or excluded "solely by reason of   his . . . disability"; and that the program or activity received federal funds. *Burns v. City of Columbus, Ohio*, 91 F.3d 836, 841 (6th Cir. 1996).

disability.  *Id.*  The ADA generally prohibits only purposeful discrimination, not inadequate medical care or accommodation of a disability.  *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).

Defendants first argue that Moore's claim must fail because he is not a qualified individual with a disability.  The ADA defines a "qualified individual with a disability" as a "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  §12131(2).  The Supreme Court has held that the term "public entity" includes state prisons.  *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).  A "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual . . . ."  42 U.S.C. 12102(2)(A).  Regulations promulgated by the Equal Employment Opportunity Commission define "physical impairment" as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting [certain] body systems."  29 C.F.R. § 1630.2(h)(1)( (2001).  According to the regulations, "major life activities" include "functions such as caring for oneself . . . [and] walking . . . ."  29 C.F.R. § 1630.2(i).  Outside of the employment context, "substantially limits" means "(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a major life activity as opposed to the condition, manner or duration under which the average person in the general population can perform the same major life activity."  29 C.F.R. §1630.2(j)(1).

Accepting Moore's claims as true, he has presented sufficient evidence that he is a "qualified individual with a disability" under the ADA to withstand a motion for summary judgment.  Federal regulations reference a theoretical "average person in the general population" to measure substantial limitations on life activities.  *See* 29 C.F.R. § 1630.2(j)(1) (stating that a person is substantially unlimited if "[u]nable to perform a major life activity that the average person in the general population can perform, or [is s]ignificantly restricted as to the condition, manner or duration under which the average

10

person in the general population can perform that same major life activity.").  Making this evaluation, the Court considers "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  *Id.* § 1630.2(j)(2).

The Sixth Circuit has explained that "moderate difficulty or pain experienced while walking does not rise to the level of a disability."  *Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997) (collecting cases).  Moore's complaint arguably extends beyond "moderate difficulty," however.  He states that his knee injury prevented him from walking the approximately 100 feet to the front of the cell house, even using a walker; that with the walker, he was able to walk only ten to fifteen feet at a time; and that whenever KSP officials transported him outside the cell house, they used a wheelchair to move him.  (Docket No. 1 at 7-8.)  Defendants suggest that Moore's arguments are both self-serving and unsubstantiated by objective medical findings.  They point to medical records, affidavits, and incident reports that indicate that Moore moved about with the assistance of a walker during the relevant period.  (*See* Docket Nos. 26-20, 26-21.)   However, in light of the generous standard applied at the summary judgment phase and to *pro se* litigants in particular, the Court determines that Moore's description of his condition constitutes sufficient evidence to raise a question of fact.

Defendants further argue that Moore's knee injury did not substantially limit any of his major life activities; they insist that his alleged inability to walk constitutes "a self-inflicted chronic pain issue exacerbated by [his] stubborn refusal to move—not a physical impairment that substantially limited [his] ability to walk."  (Docket No. 26 at 14-15.)  Such a characterization of Moore's condition, though, does not necessarily defeat his ADA claim.  Under certain circumstances, "flare-ups caused by an underlying chronic condition may constitute a disability if they occur with sufficient frequency and are of sufficient duration and severity to substantially limit a major life activity."  *Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 824 (S.D. Ohio 2004).  Moore has raised sufficient evidence to suggest that his injury limited his ability to walk to a degree that is significantly less than that of the average person in the

general population.  Accordingly, reasonable minds could differ as to whether he is a qualified individual with a disability.

Finally, the Court turns to Defendants' contention that they never denied Moore the benefits of KSP services, programs, or activities.  Title II prohibits public entities from discriminating based on an individual's disability in the provision of services, programs, or activities.  *See* 42 U.S.C. § 12132. Likewise, the Rehabilitation Act prohibits a program that receives federal funding from discriminating against an "otherwise qualified individual with a disability."  29 U.S.C. § 794(a).

Moore states that during his period in medical segregation, KSP officials denied him access to his walker, causing him to miss three meals and leaving him unable to reach the toilet.  Such isolated incidents, however, do not constitute violations of federal law.  *See Moore v. Curtis*, 68 F. App'x 561, 563 (6th Cir. 2003) (prisoner who was disabled and used a wheelchair failed to state an ADA claim when his disputes with staff resulted in only isolated instances in which he missed meals or privileges); *McCord v. Ohio Dept. of Rehab. & Corr.*, 2011 WL 768079, at *2 (N.D. Ohio Feb. 28, 2011) ("Allegations of isolated instances of failing to accommodate a disabled prisoners condition do not state a claim under the ADA.").  Moreover, an inmate's claim that a prison failed to accommodate his condition is generally better raised under the Eighth Amendment.  *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (the ADA "would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners"): *McNally v. Prison Health Servs.*, 46 F. Supp. 2d 49, 58 (D. Me. 1999) (distinguishing between "claims that the medical treatment received for a disability was inadequate" and "claims that a prisoner has been denied access to services or programs because he is disabled.").  Accordingly, the Court will grant Defendants' motion for summary judgment as to these claims.

### Conclusion and Order

In accordance with the above discussion, IT IS HEREBY ORDERED that Defendants' motion for summary judgment, (Docket No. 26), is GRANTED IN PART and DENIED IN PART.  Moore's

claims under the Eighth Amendment survive Defendants' motion for summary judgment and may proceed to trial.  Moore's claims under the Americans with Disabilities Act and the Rehabilitation Act are hereby DISMISSED as to all Defendants in this matter.